In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-3339
DUPAGE REGIONAL OFFICE OF
EDUCATION,
 Petitioner,

 v.

UNITED STATES DEPARTMENT OF
EDUCATION,
 Respondent.
 ____________________

 Petition for Review of an Order of the Department of Education.
 No. 21-36-CP
 ____________________

 ARGUED SEPTEMBER 15, 2022 — DECIDED JANUARY 23, 2023
 ____________________

 Before SYKES, Chief Judge, RIPPLE, and KIRSCH, Circuit
Judges.
 RIPPLE, Circuit Judge. In September 2020, Albert Sanchez
filed a whistleblower complaint with the United States De-
partment of Education’s Office of the Inspector General
(“OIG”) against his former employer, DuPage Regional Office
of Education (“DuPage”). Sanchez alleged that, after he made
two protected disclosures to DuPage, he suffered five
2 No. 21-3339

reprisals in violation of § 828 of the National Defense Author-
ization Act of 2013, 41 U.S.C. § 4712.
 The OIG investigated Sanchez’s complaint, determined
his claims to be unsubstantiated, and submitted a report to
the Department for a final agency decision. On October 21,
2021, an administrative law judge (“ALJ”) in the Depart-
ment’s Office of Hearings and Appeals determined, contrary
to the findings of the OIG, that Sanchez was entitled to relief
for all five alleged reprisals. The ALJ ordered DuPage to pay
Sanchez compensatory damages in the amount of $210,000.
DuPage filed a petition for review of the ALJ’s order as au-
thorized by 41 U.S.C. § 4712(c)(5). For the reasons set forth in
this opinion, we now grant the petition for review and re-
mand the case to the Department of Education for further pro-
ceedings consistent with this opinion.
 BACKGROUND
A. Sanchez’s Employment at DuPage
 DuPage Regional Office of Education is a public education
entity based in Wheaton, Illinois. Illinois’s regional offices of
education serve as intermediaries between the Illinois State
Board of Education (“ISBE”) and local school districts within
 1
their county or counties. School Code §§ 3-0.01, 3-14.2, 3-14.7.
They are “established by” the ISBE and subject to its “rules
and regulations.” Id. § 2-3.62. Each office is headed by a su-
perintendent who is elected by the citizens of the area over
 2
which they have cognizance.

1 The Illinois School Code is found at 105 ILCS 5/1-1 et seq.

2 Cook County represents a special situation. It is divided into several In-
termediate Service Centers—one serves the City of Chicago, and the
No. 21-3339 3

 In September 2017, the Department of Education awarded
DuPage two multi-year federal grants. DuPage received a
$4 million Education Innovation and Research Grant (“EIR
grant”). It also was a subgrantee of a separate $12 million Sup-
porting Effective Educator Development Grant (“SEED
grant”) that was administered by Illinois State University
(“ISU”). Both grants were designed to support local educators
and leaders through research on professional development
structures. Because of the grants’ overlapping subject matter
and purposes, DuPage and ISU collaborated closely in their
work under the two grants. This collaboration made it neces-
sary to monitor expense allocations between the grants to en-
sure compliance with federal rules and regulations.
 DuPage hired Albert Sanchez in October 2017 to assist
with grant management. Initially brought on as a contractor,
Sanchez assumed a full-time position as a budget and data
analyst several months later in January 2018. His role was to
set up financial systems and budget tools for managing both
the EIR and SEED grants. Although the precise details of the
supervisory chain were unclear, Sanchez answered primarily
to three officials at DuPage and ISU: Dr. Darlene Ruscitti, the
elected Regional Superintendent of DuPage and Sanchez’s
top-line supervisor; Dr. Alicia Haller, DuPage’s EIR grant di-
rector and Sanchez’s primary supervisor; and Dr. Erika Hunt,
ISU’s SEED grant director who had no official supervisory
role over Sanchez.
 During his employment with DuPage, Sanchez made two
protected whistleblower disclosures and experienced what he

others serve the portions of Cook County that are outside the City of Chi-
cago. Ill. Admin. Code tit. 23, §§ 525.30, 525.40; School Code § 2-3.62.
4 No. 21-3339

alleged were five reprisals in response. Under the relevant
whistleblower statute, 41 U.S.C. § 4712(a)(1), a recipient of a
federal grant is prohibited from retaliating against an em-
ployee who has disclosed “information that the employee rea-
sonably believes is evidence of … a violation of law, rule, or
regulation related to a Federal … grant.” Employers who vio-
late § 4712(a)(1) are subject to the administrative remedies
specified in § 4712(c)(1).
 Sanchez made his first disclosure around April 2018 when
Hunt submitted an invoice to him for a roughly $10,000 break-
fast expense, to be paid from the SEED grant. Sanchez told
Hunt that the invoice was not an allowable expense under
federal grant rules and refused to pay the invoice despite her
insistence that he do so. Haller and Dr. Jeremy Dotson, the
Assistant Regional Superintendent of Business at DuPage,
later confirmed Sanchez’s view that the breakfast expense
was unallowable.
 A few weeks after he had refused to pay the expense ten-
dered by Hunt, Sanchez experienced what he claimed was his
first reprisal. Haller informed him that, due to a change in pol-
icy at ISU, he was being removed from the invoice review pro-
cess for the SEED grant. According to Sanchez, Haller told
him that ISU officials had decided they did not want non-ISU
employees approving SEED grant invoices. During the OIG
investigation, Hunt stated that ISU’s change in budget policy
applied across the board and was not directed at DuPage or
any of its staff.
 Sanchez alleges that a second reprisal unfolded over a pe-
riod from December 2018 to March 2019. In December 2018,
Hunt told Haller and Ruscitti that she wanted to reduce
No. 21-3339 5

 3
Sanchez’s involvement with data infrastructure work and to
transition those duties to an outside contractor. Hunt and
Haller were concerned that Sanchez lacked the technical com-
petence and professional connections to undertake that work
effectively. To make use of Sanchez’s strengths, they decided
to shift his duties from data infrastructure to grant develop-
ment. Although Hunt indicated in a January 2019 email her
concern that Sanchez might be “upset” to have data infra-
structure work taken away from him, Haller understood
Sanchez to be pleased with the shift toward grant develop-
ment: Sanchez emailed Haller later that month, “I’m very ex-
 4
cited about this strand of the work.” Sanchez’s new job de-
scriptions were finalized in March 2019. Although the OIG
never identified any evidence that Sanchez objected to this
change of duties, Sanchez now points to this development as
an adverse employment action.
 Sanchez made his second disclosure around January and
February 2019. Haller submitted a contract for Sanchez’s ap-
proval, asking that it be applied to the EIR grant, but Sanchez
refused to do so. He told Haller that, because the work on that
contract was to be performed for the SEED grant, it would

3 It appears from the record that this work was aimed at creating a statis-
tical model of supply and demand for educators by region. As an initial
matter, this effort required building relationships with different education
actors in the state—including the ISBE, the Illinois Association of Regional
School Superintendents, other regional offices of education, and the gov-
ernor’s office—to obtain relevant data. Beyond that, the work demanded
facility with software development and technical statistical concepts. App.
110, 184–85, 196–97. Citations to “App.” refer to DuPage’s appendix con-
taining the administrative record.
4 App. 198, 201–04, 343.
6 No. 21-3339

violate federal grant rules to run the contract invoices through
the EIR grant. Haller disagreed with Sanchez’s view that her
request would amount to a misallocation of grant funds be-
cause she believed the arrangement already had been ap-
proved by DuPage’s program officer at the Department of Ed-
ucation. Nonetheless, on February 22, 2019, DuPage held a
conference call with its program officer to clarify the issue,
and the program officer cleared DuPage to continue with in-
voicing in the manner Haller had planned. It appears that,
prior to the call, there were tensions among DuPage staff con-
cerning whether Sanchez would be permitted to speak on the
call. Ultimately, he did not speak.
 The third alleged reprisal occurred on March 11, 2019,
when DuPage placed Sanchez on an employee performance
plan (“EPP”), to run from March 11 to September 30, 2019.
Although the EPP was reportedly issued on March 11 during
a meeting with Sanchez, there is some uncertainty as to when
Sanchez received a copy of the EPP: His signature on the doc-
ument is dated April 26, 2019, and he denied receiving a copy
of it before that date. The stated purpose of the EPP was to
“allow the employee the opportunity to demonstrate compe-
 5
tency and commitment” to his work. It listed areas of demon-
strated strength and areas for further improvement, with sec-
tions addressing performance goals, resources, and expecta-
tions. The document noted in closing that “[f]ailure to meet or
exceed these expectations, keep accurate records of work

5 Id. at 344.
No. 21-3339 7

completed, or violate [sic] any DuPage ROE policy, will result
 6
in disciplinary action—up to and including termination.”
 The issuance of the EPP was preceded by serious discus-
sions among DuPage and ISU staff concerning problems with
Sanchez’s performance. The record includes emails from De-
cember 2018, January 2019, and March 2019 detailing Haller’s
ongoing frustrations with Sanchez’s communication skills, or-
ganization, work product, work hours, and accounting
 7
knowledge. Haller began formally documenting her con-
cerns with Sanchez’s performance as early as March 3, 2019,
including one instance in which she claimed Sanchez created
expense tracking spreadsheets “that were off by hundreds of
 8
thousands of dollars.”
 The EPP was more immediately precipitated by a March
4, 2019 meeting between Sanchez, Ruscitti, Haller, Hunt, and
Dotson. Although the participants’ impressions of the meet-
ing varied somewhat, it appears that the meeting was aimed
at providing clarity as to Sanchez’s supervisory chain, his
roles and responsibilities, and expectations surrounding com-
munication and performance. The decision to place Sanchez
on an EPP was apparently made after Sanchez had left this
 9
meeting. It appears that Haller took the lead on drafting the
EPP, with input from Hunt and Ruscitti and possibly Dr. Mi-
chael Robey, DuPage’s Assistant Superintendent of

6 Id. at 347.

7 Id. at 365–69, 371, 373, 375, 389, 390, 392, 403, 415–17.

8 Id. at 127.

9 Id. at 114, 218.
8 No. 21-3339

 10
Operations. Haller did not view the EPP as a disciplinary
 11
action, and Hunt shared in that understanding. Sanchez,
however, believed that Haller and Hunt did not want him to
succeed in the EPP process and that the document was meant
 12
to justify his eventual termination. In the months that fol-
lowed, Haller continued to document communications with
 13
Sanchez and frustrations with his performance.
 The fourth alleged reprisal stemmed from an email to
Hunt from an ISU employee, Emilie Shoop, on August 14,
2019. The email detailed three incidents. Shoop stated in her
email that, shortly after Sanchez had joined DuPage, she was
helping him with a Zoom conference call login when his
 14
username appeared on the screen as “Hot Sex Puma.” She
also stated that, earlier that summer (2019), another ISU em-
ployee had told her that she experienced a similar incident
with Sanchez, but that the Zoom username “was something
 15
like Sex Panther.” Finally, Shoop explained that a third inci-
dent that had occurred the previous day prompted her to
send her email: She was assisting Sanchez with his laptop
when she observed the phrase “Disturbing Men

10 Id. at 114–15, 175, 187, 314.

11 Id. at 115, 187.

12 Id. at 74.

13 Id. at 114, 133–34, 137–40.

14 Id. at 163.

15 Id.
No. 21-3339 9

 16
Masturbating” autofill on his browser. Hunt promptly for-
warded Shoop’s email to Haller, who said DuPage would in-
vestigate. Haller referred the matter to Ruscitti and Dotson.
 After learning of Shoop’s email, Ruscitti, Dotson, and
Robey exchanged emails discussing whether Sanchez had vi-
olated DuPage’s harassment or acceptable use policies. Dot-
son and Robey arranged for a disciplinary meeting with
Sanchez on August 20, 2019, with a follow-up meeting on Au-
gust 29, 2019. They issued Sanchez a formal reprimand in the
form of a personnel action report (PAR). The PAR identified
the three incidents from Shoop’s email as events that “vio-
lated [DuPage’s] Acceptable Use Policy” and stated that these
events made other employees “very uncomfortable and could
 17
be considered sexual harassment.” The PAR noted that
Sanchez “acknowledged” the first incident, claiming that the
sexually explicit username belonged to a friend who had bor-
 18
rowed his computer. It then noted that Sanchez “did not re-
 19
call” the second username incident. The PAR did not say
whether Sanchez admitted, denied, or did not recall the third
incident, but it did state that this incident was witnessed by
several individuals at a meeting at ISU. Robey later reported

16 Id.

17 Id. at 318.

18 Id.

19 Id.
10 No. 21-3339

to the OIG that Sanchez had admitted to all three of the inci-
 20
dents.
 In late September 2019, Haller, Ruscitti, Robey, and Dot-
son exchanged emails in preparation for a performance ap-
praisal meeting to close Sanchez’s EPP period. In these emails,
Haller compiled a large record of documents showing
Sanchez’s unsatisfactory performance. Ruscitti gave her ap-
proval for the meeting and for his termination on September
23, 2019. On September 30, 2019, Haller and Robey led
Sanchez’s performance appraisal meeting, informed him that
his performance on the EPP was not satisfactory, and gave
him the option of resigning or being terminated. He did not
exercise the option of resigning. Sanchez was terminated on
October 4, 2019, for the stated reason that he was “rated un-
 21
satisfactory with no defense given.” Sanchez points to his
termination as the fifth act of reprisal.
B. Administrative Proceedings
 1. The OIG Report
 On September 23, 2020, Sanchez filed a whistleblower
complaint against DuPage with the Department’s Office of
the Inspector General. The OIG conducted a year-long inves-
tigation in which it interviewed eight individuals and com-
 22
piled roughly 1,000 pages of documentary evidence.

20 Id. at 313–14.

21 Id. at 1002.

22 Under 41 U.S.C. § 4712(b)(1), Sanchez filed a complaint with the OIG,
which was in turn required to “investigate the complaint and, upon
No. 21-3339 11

 The OIG framed its report in terms of the burden-shifting
scheme employed under the whistleblower statute. 41 U.S.C.
§ 4712(c)(6) (directing adjudicators to apply the scheme in
5 U.S.C. § 1221(e)). Sanchez had the initial burden of showing
that a disclosure was a “contributing factor” in a decision to
take a personnel action. 5 U.S.C. § 1221(e)(1). He could meet
that burden with circumstantial evidence, such as evidence
that “the official taking the personnel action knew of the dis-
closure” and that “the personnel action occurred within a pe-
riod of time such that a reasonable person could conclude that
the disclosure or protected activity was a contributing factor
in the personnel action.” Id. § 1221(e)(1)(A)–(B). If Sanchez
were to meet his burden, DuPage could avoid liability by
showing “by clear and convincing evidence that it would
have taken the same personnel action in the absence of such
disclosure.” Id. § 1221(e)(2). Applying that framework, the
OIG found that all of Sanchez’s alleged reprisals were unsub-
stantiated.
 a.
 First Reprisal. As to the first alleged reprisal around April
2018, the OIG found that Sanchez’s disclosure concerning un-
allowable catering expenses was a contributing factor in his
removal from SEED grant financial oversight duties based on
Hunt’s knowledge of the disclosure and the temporal prox-
imity of the action. But the OIG also determined that ISU’s
change in budget policy—a decision to limit SEED grant fi-
nancial oversight to ISU employees—constituted “clear and

completion of such investigation, submit a report of the findings” to the
agency for a final determination.
12 No. 21-3339

convincing evidence that [DuPage] would have removed his
 23
financial duties regardless of this disclosure.”
 b.
 Second Reprisal. The OIG determined that Sanchez’s disclo-
sures were not a contributing factor in his change of duties
between December 2018 and March 2019. The OIG found that
none of the officials involved in this change—Haller, Hunt, or
 24
Ruscitti —had any knowledge of the catering disclosure of
April 2018. And because this personnel action “occurred or
was initiated likely prior to his second protected disclosure”
in January and February 2019, that disclosure “could not have
 25
been a contributing factor.” In any case, the OIG determined
that the change of duties was simply a result of Sanchez’s de-
ficient performance on the data infrastructure work.
 c.
 Third Reprisal. Because of the temporal proximity to the
second disclosure and the knowledge of the officials in-
volved—Haller, Hunt, Ruscitti, and Dotson—the OIG deter-
mined that Sanchez’s disclosure was a contributing factor to
his placement on an EPP on March 11, 2019. The OIG further
found, however, that “numerous e-mails and witness testi-
mony” from DuPage personnel showed that Sanchez had
“significant performance issues” and that DuPage had

23 App. 33.

24 Id. at 34. The OIG report misstated its finding here. A page earlier, the
OIG found that Hunt did have knowledge. Id. at 33. And Sanchez stated
that he made the disclosure directly to Hunt. Id. at 69.
25 Id. at 34–35.
No. 21-3339 13

accordingly shown by clear and convincing evidence that it
would have placed Sanchez on an EPP regardless of his dis-
 26
closures.
 d.
 Fourth Reprisal. The OIG did not clearly state whether it
thought Sanchez had met his initial burden with respect to
issuance of the PAR. But the OIG found, in any case, that Du-
Page had “clear and convincing evidence the PAR would
have been issued based on the multiple, repeat incidents of
 27
inappropriate conduct.” The OIG further noted its finding
that the PAR was issued in accordance with DuPage policy
and shortly after the complaint was received.
 e.
 Fifth Reprisal. Finally, as to Sanchez’s termination, the OIG
determined that the disclosures were a contributing factor to
the extent of Haller’s and Ruscitti’s involvement in the deci-
sion, but not as to Robey’s involvement. Nonetheless, the OIG
concluded that there was clear and convincing evidence that
DuPage would have terminated Sanchez even without the
disclosures. It noted DuPage’s “documentation, including
emails and memos, that demonstrated Sanchez’s numerous
 28
performance issues throughout his employment.”

26 Id. at 37.

27 Id. at 38.

28 Id. at 40.
14 No. 21-3339

 2. ALJ Decision
 After the OIG submitted its report, the case was referred
to an ALJ within the Department’s Office of Hearings and Ap-
peals who had been delegated authority to render a final
agency decision. DuPage and Sanchez waived a hearing with
testimony before the ALJ and agreed to proceed on written
submissions. Both parties submitted briefs, and Sanchez filed
some additional documents. The ALJ also received an unre-
dacted copy of the OIG’s report.
 On October 20, 2021, the ALJ issued a decision and order.
She disagreed with the OIG’s determinations, found that Du-
Page had retaliated against Sanchez on five occasions in vio-
lation of § 4712, and ordered DuPage to pay Sanchez compen-
satory damages in the amount of $210,000.
 a.
 First Reprisal. On the first alleged reprisal—the removal of
Sanchez’s SEED grant oversight duties—the ALJ agreed with
the OIG in finding that Sanchez’s disclosure of unallowable
catering expenses was a contributing factor. The ALJ found
that Haller “[c]learly” had knowledge of the disclosure “con-
temporaneously with the events” and that the reprisal “oc-
 29
curred nearly simultaneously with [the] disclosure.” But un-
like the OIG, the ALJ did not think that DuPage met its shifted
burden. Although she did not explain why, the ALJ appar-
ently did not credit DuPage’s defense that the removal of du-
ties was the result of a change in policy at ISU that was appli-
cable to all non-ISU employees. The ALJ also did not discuss

29 Id. at 1127.
No. 21-3339 15

whether or how DuPage should be held responsible for a de-
cision made by ISU officials.
 b.
 Second Reprisal. The ALJ also believed that at least one of
Sanchez’s disclosures was a contributing factor in the decision
to transition him away from data infrastructure duties from
December 2018 to March 2019. Contrary to the OIG’s findings,
the ALJ believed that Sanchez’s second disclosure in January
and February 2019 was a factor in this personnel action: Alt-
hough the disclosure occurred “after [DuPage] began to con-
sider a job change” in December 2018, it was “before
[Sanchez’s] new job description … was created and imple-
 30
mented” in March 2019. In the ALJ’s view, this timing was
sufficient to show that the second disclosure was a contrib-
uting factor in the change of duties that was finalized in
March 2019. It was not clear whether the ALJ also thought the
first disclosure from April 2018 was a contributing factor.
 The ALJ then found that DuPage had failed to carry its
burden of showing that it would have implemented this
change of duties even without Sanchez’s disclosure(s). Alt-
hough DuPage had argued that it took this action because
Sanchez lacked the knowledge and professional connections
necessary to perform the data infrastructure work effectively,
the ALJ did not address this argument. Instead, the ALJ
simply reiterated her view that the temporal sequence of
events did not bar a finding that the second disclosure was a
contributing factor in the change of duties.

30 Id. at 1130.
16 No. 21-3339

 c.
 Third Reprisal. Like the OIG, the ALJ concluded that at least
one of Sanchez’s disclosures was a contributing factor to the
issuance of an EPP on March 11, 2019. The ALJ appeared to
base this finding on the temporal proximity between the EPP
issuance and the second disclosure. Unlike the OIG, however,
the ALJ found that DuPage failed to meet its shifted burden.
The ALJ discussed extensively accounts of the March 4, 2019
meeting that precipitated the EPP, and she seemingly found
it relevant that participants had varying impressions of the
tone of the meeting. The ALJ also noted that, although the EPP
period began on March 11, there was no documented evi-
dence that Sanchez received a copy of the EPP document until
April 26, 2019. Sanchez claimed that he did not receive a copy
until that date. Ultimately, in the ALJ’s view, the vagueness
surrounding these events reduced the probative value of Du-
Page’s assertions that the EPP was aimed at improving
Sanchez’s performance issues, so DuPage failed to carry its
burden.
 d.
 Fourth Reprisal. The ALJ found that Sanchez’s disclosures
were a contributing factor in DuPage’s formal reprimand of
Sanchez for the three reported incidents of sexually explicit
language appearing on his computer. According to the deci-
sion, the PAR’s descriptions of the incidents were inconsistent
with the descriptions in the Shoop email because the PAR ex-
aggerated their significance, misidentified the timing of the
events, and misreported that the events were witnessed by
several individuals. Although the PAR noted Sanchez’s
acknowledgement of the first incident and his lack of recollec-
tion of the second, it did not state whether he acknowledged,
No. 21-3339 17

denied, or did not recall the third. Thus, despite the seven
months’ time between the second disclosure and the PAR, the
ALJ found that there was “still reason to conclude” that
 31
Sanchez had met his initial burden.
 The ALJ did not think that DuPage met its shifted burden
to show that it would have issued the PAR even without the
disclosures. She found that Robey’s description to the OIG of
the PAR process was inconsistent with the document: Robey
told the interviewer that Sanchez admitted to all three inci-
dents, but the PAR only noted his acknowledgement of the
first. And she reiterated her finding that the PAR exaggerated
the seriousness of the reported incidents. Finally, the ALJ de-
termined that the two officials involved, Robey and Dotson,
were each downplaying their role in the action.
 e.
 Fifth Reprisal. Once again, the ALJ disagreed with the
OIG’s finding and instead concluded that Sanchez’s termina-
tion was retaliatory. The ALJ’s reasoning rested on how
closely tied the termination was to the EPP, which she had
already concluded was a reprisal: Sanchez was terminated
based on his unsatisfactory rating at the end of the EPP pe-
riod, on September 30, 2019, and so the EPP formed the basis
for his termination. Thus, in the ALJ’s view, Sanchez’s con-
tributing factor showing on the EPP essentially extended tran-
sitively to the termination as well.
 The ALJ then found that DuPage failed to carry its shifted
burden. She reviewed documentation that DuPage had pro-
vided which, she found, discussed Sanchez’s performance

31 Id. at 1135.
18 No. 21-3339

failures “in excruciating detail,” but she concluded that, in de-
veloping all of its documentation, DuPage was simply “mi-
cromanaging” Sanchez rather than supporting his perfor-
 32
mance. And, in the ALJ’s view, DuPage’s defense that the
termination was based on deficient performance was under-
cut by her findings that DuPage had failed to provide Sanchez
regular performance assessments, as required by policy, and
that there was significant uncertainty as to Sanchez’s proper
supervisory chain throughout his employment.
 f.
 Damages Order. The ALJ determined that Sanchez should
 33
be compensated for “lost wages due to the acts of reprisals.”
Finding that Sanchez would have been compensated in the
amount of $105,000 per year for the period of October 5, 2019,
through the date of her order, October 20, 2021, she ordered
DuPage to pay Sanchez damages in the amount of $210,000.
The ALJ noted that, although § 4712 permitted awarding costs
and attorney’s fees, she did not find it reasonable to do so.
 DuPage petitioned for review as authorized by
§ 4712(c)(5).
 DISCUSSION
 DuPage raises two arguments in its petition for review. As
an initial matter, it submits that it enjoys sovereign immunity
as an arm of the State of Illinois, that its immunity has not
been abrogated or waived, and that the Department’s order
was therefore barred by sovereign immunity. See Fed. Mar.

32 Id. at 1136.

33 Id. at 1138.
No. 21-3339 19

Comm’n v. S.C. State Ports Auth., 535 U.S. 743, 747, 760 (2002).
Alternatively, DuPage contends that even if sovereign im-
munity does not bar a federal proceeding against it, the De-
partment’s decision should be vacated as arbitrary and capri-
cious and unsupported by substantial evidence. We address
each argument in turn.
 Eleventh Amendment Immunity
 A.
 Under the Eleventh Amendment, the states, including
those entities that can be considered “arms of the state,” are
generally immune from suit in federal court. This immunity
does not extend, however, to other political or municipal en-
tities created by states. Alden v. Maine, 527 U.S. 706, 756 (1999).
The Supreme Court recognized this exception for local enti-
ties in Lincoln County v. Luning, 133 U.S. 529 (1890), a case
dealing with whether a local county enjoyed immunity. The
Court wrote:
 [W]hile the county is territorially a part of the
 state, yet politically it is also a corporation cre-
 ated by, and with such powers as are given to it
 by, the state. In this respect, it is a part of the
 state only in that remote sense in which any city,
 town, or other municipal corporation may be
 said to be a part of the state.
Id. at 530; see also Moor v. Alameda Cnty., 411 U.S. 693, 717–21
(1973).
 A line of case law has developed to identify entities which
bear a closer relationship to the state and therefore operate as
“arms of the state.” The anchor Supreme Court case in this
jurisprudence is Mt. Healthy City School District Board of
20 No. 21-3339

Education v. Doyle, 429 U.S. 274 (1977). In evaluating a school
district’s invocation of Eleventh Amendment immunity, the
Supreme Court explained that the issue was “whether the Mt.
Healthy Board of Education is to be treated as an arm of the
State partaking of the State’s Eleventh Amendment immun-
ity, or is instead to be treated as a municipal corporation or
other political subdivision to which the Eleventh Amendment
does not extend.” Id. at 280. “The answer depends,” the Court
held, “at least in part, upon the nature of the entity created by
state law.” Id. Looking to Ohio law, the Court noted that the
“many local school boards” within the state were “subject to
some guidance from the State Board of Education” and “re-
ceive[d] a significant amount of money from the State.” Id. At
the same time, the school boards had “extensive powers to is-
sue bonds” and “to levy taxes within certain restrictions of
state law.” Id. Consequently, “[o]n balance,” the local school
board was “more like a county or city than … like an arm of
the State.” Id. It was not entitled to immunity.
 We first applied Mt. Healthy’s arm-of-the-state analysis in
Mackey v. Stanton, 586 F.2d 1126 (7th Cir. 1978). There we ad-
dressed the immunity of the Elkhart County Department of
Public Welfare. Noting Mt. Healthy’s statement that the im-
munity issue “depends, at least in part, upon the nature of the
entity created by state law,” we also noted that, “[a]lthough
the Court did not express its reasons for reaching this result,”
it was “inferable … that the Court was impressed with the
statutory power of the local school district to raise its own
funds when the need arose.” Id. at 1130. Moreover, we in-
ferred, the Court “may have found” it “particularly signifi-
cant” that the school district was authorized “to collect money
to pay judgments against it, indicating that the state treasury
would not have to pay such judgments.” Id.
No. 21-3339 21

 Turning to the Indiana statutes, we decided that the
county’s Department of Public Welfare was like the Mt.
Healthy school board “[i]n all respects that the Supreme Court
seemed to consider significant.” Id. at 1131. We explained:
 Although both are subject to state supervision
 and depend heavily on state funds, they per-
 form their duties on a local level. More im-
 portant, both have the power to raise their own
 funds by tax levy and by bond issuance. Signif-
 icantly, [the Indiana statute] is analogous to [the
 statute in Mt. Healthy], providing a manner for
 payment of judgments without resort to the
 state treasury.
Id.
 We returned to this issue in Kashani v. Purdue University,
813 F.2d 843 (7th Cir. 1987). In considering whether Purdue
University was an arm of the State of Indiana, we divided our
analysis into two parts. First, “[t]he most important factor
[was] the extent of the entity’s financial autonomy from the
state.” Id. at 845. Evaluation of this factor required that we ex-
amine “the extent of state funding, the state’s oversight and
control of the university’s fiscal affairs, the university’s ability
independently to raise funds, whether the state taxes the uni-
versity, and whether a judgment against the university would
result in the state increasing its appropriations to the univer-
sity.” Id. Second, we considered “the general legal status of
the university.” Id. at 846–47 (citing Mt. Healthy, 429 U.S. at
280). This “general legal status” inquiry “cannot be resolved
by simple reference to Indiana statutory definitions”; instead,
we “must look to substance rather than form.” Id. Here, we
found it significant that the Governor of Indiana appointed
22 No. 21-3339

the university’s governing council. Id. We held that, in view
of these two considerations, Purdue University was an arm of
the State of Indiana.
 In 2008, we read Kashani as presenting a two-factor test:
“To determine if a particular entity is an arm of the state,
courts look primarily at two factors: (1) the extent of the en-
tity’s financial autonomy from the state; and (2) the ‘general
legal status’ of the entity.” Burrus v. State Lottery Comm’n of
Ind., 546 F.3d 417, 420 (7th Cir. 2008) (citing Kashani, 813 F.2d
at 845–47). The financial autonomy inquiry is the “most im-
portant factor,” and, among the subfactors identified in
Kashani, the most probative evidence of financial autonomy is
whether judgments against the entity would be paid by the
entity itself or by the state treasury. Id. (quoting Peirick v. Ind.
Univ.-Purdue Univ. Indianapolis Athletics Dep’t, 510 F.3d 681,
695 (7th Cir. 2007)).
 Because we have encountered the arm-of-the-state issue
on relatively few occasions, we have examined the decisions
of our sister circuits to ensure that our approach is within the
heartland of the national approach. Cf. Hess v. Port Auth.
Trans-Hudson Corp., 513 U.S. 30, 48 (1994) (noting with ap-
proval that the courts of appeals “have recognized the vulner-
ability of the State’s purse as the most salient factor” in arm-
of-the-state analysis). The Third Circuit has articulated “three
major criteria” for assessment: “(1) whether the payment of
the judgment would come from the state, (2) what status the
entity has under state law, and (3) what degree of autonomy
the entity has.” Febres v. Camden Bd. of Educ., 445 F.3d 227, 229
(3d Cir. 2006). The Fifth Circuit examines six factors:
 (1) whether the state statutes and caselaw view
 the agency as an arm of the state; (2) the source
No. 21-3339 23

 of the entity’s funding; (3) the entity’s degree of
 local autonomy; (4) whether the entity is con-
 cerned primarily with local, as opposed to
 statewide, problems; (5) whether the entity has
 the authority to sue and be sued in its own
 name; and (6) whether the entity has the right to
 hold and use property.
Black v. N. Panola Sch. Dist., 461 F.3d 584, 596 (5th Cir. 2006)
(quoting United States ex rel. Barron v. Deloitte & Touche, L.L.P.,
381 F.3d 438, 440 (5th Cir. 2004)). That court “give[s] the most
weight” to the source of funding, with special attention first
to “whether the state would be liable for a judgment against
the defendant and then to whether the state would be liable
for the defendant’s general debts and obligations.” Id. (quot-
ing Barron, 381 F.3d at 440). Our neighbor to the east, the Sixth
Circuit, considers four factors:
 (1) the State’s potential liability for a judgment
 against the entity; (2) the language by which
 state statutes and state courts refer to the entity
 and the degree of state control and veto power
 over the entity’s actions; (3) whether state or lo-
 cal officials appoint the board members of the
 entity; and (4) whether the entity’s functions fall
 within the traditional purview of state or local
 government.
Ernst v. Rising, 427 F.3d 351, 359 (6th Cir. 2005) (citations omit-
ted). It identifies “the state treasury’s potential legal liability
for the judgment” as “the foremost factor.” Id. The Ninth Cir-
cuit considers five factors:
24 No. 21-3339

 (1) whether a money judgment would be satis-
 fied out of state funds; (2) whether the entity
 performs central governmental functions;
 (3) whether the entity may sue or be sued;
 (4) whether the entity has the power to take
 property in its own name or only in the name of
 the state; and (5) the corporate status of the en-
 tity.
Holz v. Nenana City Pub. Sch. Dist., 347 F.3d 1176, 1180 (9th Cir.
2003) (cleaned up). These factors are to be analyzed “in light
of the way [state] law treats the governmental agency.” Id. at
1181 (quoting Belanger v. Madera Unified Sch. Dist., 963 F.2d
248, 251 (9th Cir. 1992)). The Tenth Circuit employs a two-step
process. Hennessey v. Univ. of Kan. Hosp. Auth., 53 F.4th 516,
528 (10th Cir. 2022). First, it evaluates four primary factors:
(1) “the character ascribed to the entity under state law,”
(2) “the degree of control the state exercises over the entity,”
(3) “the amount of state funding the entity receives” and
“whether the entity has the ability to issue bonds or levy taxes
on its own behalf,” and (4) “whether the entity in question is
concerned primarily with local or state affairs.” Id. (quoting
Steadfast Ins. Co. v. Agric. Ins. Co., 507 F.3d 1250, 1253 (10th Cir.
2007)). “If these factors are in conflict and point in different
directions,” it then “proceed[s] to the second step and con-
sider[s] the ‘twin reasons’ underlying the Eleventh Amend-
ment—avoiding an afront to the dignity of the state and the
impact of a judgment on the state treasury.” Id. (citations
omitted). “Of these twin reasons, the foremost reason for sov-
ereign immunity is avoiding state liability for any judgment
against the entity.” Id. (citations and internal quotation marks
omitted). The Eleventh Circuit evaluates four factors:
“(1) how state law defines the entity; (2) what degree of
No. 21-3339 25

control the State maintains over the entity; (3) where the en-
tity derives its funds; and (4) who is responsible for judg-
ments against the entity.” Lightfoot v. Henry Cnty. Sch. Dist.,
771 F.3d 764, 768 (11th Cir. 2014) (quoting Manders v. Lee, 338
F.3d 1304, 1309 (11th Cir. 2003)).
 Notably, most circuits identify legal liability for money
judgments as the most significant factor or subfactor in the
analysis. See, e.g., Burrus, 546 F.3d at 420; Holley v. Lavine, 605
F.2d 638, 644 (2d Cir. 1979); Belanger, 963 F.2d at 251 (describ-
ing legal liability as the “most important factor”); Thomas v.
St. Louis Bd. of Police Comm’rs, 447 F.3d 1082, 1084 (8th Cir.
2006) (“[C]ourts assess the agency’s degree of autonomy and
control over its own affairs and, more importantly, whether a
money judgment against the agency will be paid with state
funds.”). The significance of the legal liability factor seems to
stem from the principle articulated in Edelman v. Jordan, 415
U.S. 651, 663 (1974), that “a suit by private parties seeking to
impose a liability which must be paid from public funds in
the state treasury is barred by the Eleventh Amendment.” See,
e.g., Unified Sch. Dist. No. 480 v. Epperson, 583 F.2d 1118, 1122
(10th Cir. 1978) (citing Edelman, 415 U.S. 651) (“[I]t is agreed
that if the money judgment sought to be entered against a
board or agency will be satisfied out of the state treasury, then
the board is immune from suit under the Eleventh Amend-
ment.”); Ronwin v. Shapiro, 657 F.2d 1071, 1073 (9th Cir. 1981)
(citing Edelman, 415 U.S. at 664) (“[A] crucial question … is
whether the named defendant has such independent status
that a judgment against the defendant would not impact the
state treasury.”).
 As the courts of appeals have developed this well-trod
path, the Supreme Court has confirmed the primacy of legal
26 No. 21-3339

liability in the analysis, observing that “prevention of federal-
court judgments that must be paid out of a State’s treasury”
was the “impetus for the Eleventh Amendment.” Hess, 513
 34
U.S. at 48. Therefore, the Court has instructed that “[w]hen
indicators of immunity point in different directions, the Elev-
enth Amendment’s twin reasons for being”—protecting
States’ dignity and financial solvency—“remain our prime
guide.” Id. at 39–40, 47.
 B.
 We now focus our lens on public school entities. In line
with our general approach, which is certainly well within the
heartland of the national approach, we have held that a “local
school district ordinarily is not a ‘State’ and hence may be
sued in federal court.” Gary A. v. New Trier High Sch. Dist. No.
203, 796 F.2d 940, 945 (7th Cir. 1986). In Gary A., the plaintiffs
brought an action against an Illinois school district, its board,
and the State Board of Education. Although we determined
that the State Board was entitled to Eleventh Amendment im-
munity, we rejected the local defendants’ claim to immunity.
Id. at 944, 946. The local defendants rested their argument on
two financial realities: first, the school district received a “sig-
nificant amount of money from the state,” and second, the
state had decided to reimburse the local defendants if judg-
ment were to be entered against them in the suit. Id. at 944–45
(quoting Mt. Healthy, 429 U.S. at 280). In our view, neither ra-
tionale was persuasive. As to the first, we noted that in Mt.
Healthy it was “irrelevant” that the state provided funds to the

34 The Court also demonstrates in Hess that this conclusion was compati-
ble with the original intent of the Amendment. See also Petty v. Tenn.–Mo.
Bridge Comm’n, 359 U.S. 275, 276 n.1 (1959).
No. 21-3339 27

local entity, some of which could be used to pay judgments.
Id. at 945. Rather, what was important was that the school
boards had “extensive powers to issue bonds and levy taxes”
and that they “usually pa[id] their own judgments.” Id. As in
Mt. Healthy, the Illinois school board in Gary A. had such pow-
ers. Id. As to the second—the state’s decision to reimburse the
school board—we determined this argument was fundamen-
tally mistaken: “A state’s decision to indemnify a state em-
ployee or subdivision does not grant that employee or subdi-
vision constitutional immunity” because a state “may not, by
state law, expand a limited constitutional immunity.” Id. Of
course, if the state had created an entity that had the “nature”
of an arm of the state—such as “a single state agency to con-
trol all public education”—then it might have been entitled to
immunity. Id. at 945 n.9. However, because the school board
was local in nature, the judgment would “run against the local
defendants only,” regardless of what decisions the state then
made regarding reimbursement. Id. at 945.
 More recently, in Parker v. Franklin County Community
School Corp., 667 F.3d 910 (7th Cir. 2012), the plaintiffs brought
suit under 42 U.S.C. § 1983 against fourteen Indiana public
school corporations. The school corporations there argued
that they were arms of the state and, as such, not “persons”
within the meaning of § 1983. Id. at 926. We read Mt. Healthy
as laying out four factors for analysis: “(1) the characterization
of the district under state law; (2) the guidance and control
exercised by the state over the local school board; (3) the de-
gree of state funding received by the district; and (4) the local
board’s ability to issue bonds and levy taxes on its own be-
half.” Id. at 927 (citing Mt. Healthy, 429 U.S. at 280). We further
noted the Supreme Court’s instruction to look to “legal liabil-
ity” to determine whether “the state is the real, substantial
28 No. 21-3339

party in interest.” Id. (quoting Regents of the Univ. of Cal. v. Doe,
519 U.S. 425, 429, 431 (1997)).
 Beginning with the “most salient factor,” legal liability, we
observed that it was the local defendants, not the State of In-
diana, who would be obligated to pay a judgment in the in-
stant case. Id. Although Indiana funded “a significant portion
of the schools’ budget, school corporations still ha[d] the
power to levy taxes and issue bonds under certain circum-
stances for non-operating funds.” Id. at 928. Additionally, the
state guaranteed school corporations’ debts, but “only to the
extent of the amounts appropriated for the school” by the
General Assembly. Id. We also noted that “the general legal
status of school corporations” was “political subdivisions
with locally elected school board members and superinten-
dents (not gubernatorial appointments) who serve local com-
munities (not the State of Indiana as a whole).” Id. They were
“independent corporate bodies” with the ability to “sue and
be sued and enter into contracts.” Id. In sum, despite the
state’s provision of substantial funding to the school corpora-
tions, their “political” and “operational” independence and
their “ability to raise their own funds for purposes of paying
judgments” led us to characterize them as “persons” under
§ 1983 rather than as arms of the state. Id. at 929.
 Helpfully, decisions in other circuits shed light on the
characterization of educational bodies under different states’
statutory structures. In Febres v. Camden Board of Education, 445
F.3d 227, 229 (3d Cir. 2006), the Third Circuit evaluated a
board of education’s classification employing three criteria—
legal liability for judgments, the entity’s status under state
law, and the degree of autonomy the entity possessed. It de-
cided that the board’s “status” clearly “militate[d] against
No. 21-3339 29

immunity”: The board could sue or be sued, was separately
incorporated, and was not immune from state taxation. Id. at
230. The “autonomy” factor, on the other hand, “weigh[ed]
only slightly in favor” of immunity: The board was required
to deliver its meeting minutes to the governor, who had lim-
ited veto powers over its actions, and the governor had lim-
ited powers to appoint members to the board. Id. at 231. Be-
cause those two factors pointed in different directions, the le-
gal liability factor was “particularly significant.” Id. at 232.
The district court had ruled for the board on this issue on the
ground that, because of the “magnitude of the state’s fund-
ing” to the board, any judgment against it would inevitably
be paid with state funds. Id. at 232–33. But the Third Circuit
found this reasoning misguided: The real issue was not
whether state funds would be used, but rather “the nature of
the state’s financial contributions” to the board. Id. at 233. It
was not relevant whether the board satisfied a judgment with
funds “which had initially been provided by the state” be-
cause there was no suggestion that the state “retain[ed] own-
ership or control of the funds appropriated” to the board. Id.
at 234. And the record indicated that the board received some
funds from some non-state sources and had the ability to
“raise revenues through taxes.” Id. at 233–34. Finally, as we
had reasoned in Gary A., the Third Circuit found it irrelevant
that the state would likely increase appropriations to the
board to offset the cost of a court judgment against it. Id. at
234. Such a “discretionary subsidy” was not indicative of a
“legal obligation” on the part of the state to satisfy the board’s
30 No. 21-3339

judgments. Id. On balance, the court concluded, the board was
 35
not an arm of the state. Id. at 237.
 The Eleventh Circuit addressed the issue in Lightfoot v.
Henry County School District, 771 F.3d 764 (11th Cir. 2014). The
court identified four factors for consideration: (1) state law’s
definition of the entity; (2) the state’s degree of control; (3) the
source of the entity’s funds; and (4) legal liability for judg-
ments against the entity. Id. at 768 (citing Manders, 338 F.3d at
1309). At the outset of the discussion, it observed that “the Su-
preme Court and the vast majority of appellate courts that
have considered the issue have found that school districts and
school boards are not entitled to Eleventh Amendment im-
munity.” Id. at 768–69. Although the court found that all four
factors weighed against immunity, its analysis of the second
factor is particularly noteworthy for its exacting standard on
state control.
 On the first factor, the court noted that Georgia courts had
described county boards of education—which governed each
county’s school district—as agencies through which the coun-
ties, as subdivisions of the state, act in school matters. Id. at

35 In 2017, the Third Circuit again had occasion to consider the status of
Camden’s school district. See Denkins v. State Operated Sch. Dist. of City of
Camden, 715 F. App’x 121, 124 (3d Cir. 2017). In Denkins, the court ex-
plained that because of “factual changes since Febres—specifically, the full
state takeover and the relocation of responsibilities from the Board to the
state-appointed Superintendent”—it was necessary to reassess arm-of-
the-state status. Id. In view of this assertion of state control, the court con-
cluded that the analysis now favored treating Camden’s school district as
an arm of the state. Id. at 124-26. However, Denkins did not disturb the
reasoning of Febres as applied to the facts of that case and indeed relied on
Febres in its own analysis. See id.
No. 21-3339 31

769. Additionally, the court observed that Georgia’s constitu-
tion and code grouped school districts together with counties,
municipalities, and other political subdivisions. Id. at 770. On
the second factor, the court found that Georgia school districts
were “largely under local control” because they were subject
to the management of locally elected county boards of educa-
tion. Id. at 771–72. Moreover, districts had “substantial auton-
omy over their affairs,” could “sue and be sued,” and could
“purchase property, borrow money, enter contracts, and issue
bonds.” Id. at 772. And, in the Eleventh Circuit’s view, the
state’s significant control over education policy and regula-
tion—including the establishment of basic education require-
ments, teaching standards, and budget reviews—did not
amount to “the requisite control for Eleventh Amendment
purposes.” Id. at 772–73. On the third factor, the school district
had strictly limited powers to tax, issue bonds, and borrow
money; it relied “heavily” on state funding for the remaining
65% of its budget. Id. at 775. Nonetheless, the Eleventh Circuit
deemed the school district’s “local fundraising capabilities
similar to the school board in Mt. Healthy.” Id. at 777. On the
final factor, the court observed that the school board’s “fiscal
autonomy means that it cannot be said that a judgment
against [it] will come from state funds.” Id. at 778 (cleaned
up). Thus, all four factors weighed against classifying the
school district as an arm of the state.
 In Woods v. Rondout Valley Central School District Board of
Education, 466 F.3d 232, 239–40 (2d Cir. 2006), the Second Cir-
cuit pointed out the need to distinguish between a school dis-
trict and a school district’s board of education, which had
“separate corporate existences” under New York law. With
that distinction in mind, the court laid out its six-factor test:
32 No. 21-3339

 (1) how the entity is referred to in the docu-
 ments that created it; (2) how the governing
 members of the entity are appointed; (3) how
 the entity is funded; (4) whether the entity’s
 function is traditionally one of local or state gov-
 ernment; (5) whether the state has a veto power
 over the entity’s actions; and (6) whether the en-
 tity’s obligations are binding upon the state.
Id. at 240 (quoting Mancuso v. N.Y. State Thruway Auth., 86
F.3d 289, 293 (2d Cir. 1996)). If the six factors all pointed in
one direction, the court’s inquiry was “complete.” Id. If they
pointed in different directions, the court would then focus “on
the twin reasons for the Eleventh Amendment” as identified
in Hess—protecting the state’s dignity and fiscal integrity. Id.;
see Hess, 513 U.S. at 39–40. “If the outcome still remains in
doubt, then whether a judgment against the governmental en-
tity would be paid out of the state treasury generally deter-
mines the application of Eleventh Amendment immunity.”
Woods, 466 F.3d at 241. The Second Circuit found that its six
factors weighed against immunity. First, New York law iden-
tified boards of education as “bod[ies] corporate,” and it de-
fined school districts as “public corporation[s].” Id. at 243–44
(quoting N.Y. Educ. Law § 1701; N.Y. Const. art. X, § 5). It was
thus “reasonable to infer that a board of education, like the
district it governs, is a municipal corporation.” Id. at 244. Sec-
ond, board members were elected locally. Id. Third, the school
district’s funds—which were administered and expended by
the board—were drawn both from state appropriations and
from local property taxes. Id. at 245. This was sufficient to
weigh against arm-of-the-state status. Id. Fourth, although
“New York views public education as a state rather than local
function,” it remained the case that “many of the functions
No. 21-3339 33

performed by boards of education” were “generally regarded
as connected with local government,” so this factor could not
support the claim to be an arm of the state. Id. at 245–46 (quot-
ing Lanza v. Wagner, 183 N.E.2d 670, 675 (N.Y. 1962)). Fifth,
the state did not possess veto power over the board’s actions.
Although the state education commissioner possessed “un-
doubtedly broad” powers over boards—including the power
“to remove for cause any school officer, including a member
of a board of education, and to withhold funds from a school
district under certain circumstances”; “to review various offi-
cial acts by a board of education”; and “to institute proceed-
ings … to enforce any law pertaining to the school system”—
these powers did not “unequivocally equate to veto author-
ity.” Id. at 248. Sixth, New York law required the board to
maintain a reserve fund to cover property loss and liability
claims, and it further provided that if such fund proved insuf-
ficient to satisfy a judgment, the board would have to obtain
additional funds by levying a tax within the district. Id. at 249–
50. Thus, a judgment against the board was not binding on
the state. The board was not an arm of the state.
 We have found two federal appellate decisions concluding
that a local education entity was an arm of the state. In Bel-
anger v. Madera Unified School District, 963 F.2d 248 (9th Cir.
1992), the Ninth Circuit evaluated the status of a California
school district. Although the court found that parts of its five-
factor test were a close call, the first and most important fac-
tor—legal liability—clearly favored classification as an arm of
the state. Id. at 251. The court observed that, “[u]nlike most
states, California school districts have budgets that are con-
trolled and funded by the state government rather than the
local districts.” Id. California’s “centralized control of school
funding” resulted in a system in which “state and local
34 No. 21-3339

revenue is commingled in a single fund under state control,
and local tax revenue lost to a judgment must be supplanted
by the interchangeable state funds already in the district
budget.” Id. at 251–52. Thus, any judgment against a school
district would, in fact, be directly covered by state funds. Un-
der this unique funding scheme, California’s school districts
were arms of the state. In Perez v. Region 20 Education Service
Center, 307 F.3d 318 (5th Cir. 2002), the Fifth Circuit found that
a Texas education service center was an arm of the state. Ap-
plying its six-factor test, the court considered it significant
that Texas case law treated the centers as arms of the state and
that, although locally selected, the centers’ boards of directors
were subject to supervision and removal by the state educa-
tion commissioner. Id. at 328, 330. The state education com-
missioner also approved the appointment of each center’s ex-
ecutive director and could remove an executive director for
poor performance. Id. at 330. Despite circuit case law to the
contrary, the court did not closely scrutinize whether Texas
had a legal obligation to pay judgments or debts of a center and
instead was satisfied that it was “likely that a judgment”
against a center “would be paid in large portion by the state.”
Id. at 328–29; cf. Vogt v. Bd. of Comm’rs of Orleans Levee Dist.,
294 F.3d 684, 693 (5th Cir. 2002) (emphasizing that the proper
inquiry is whether the state has an obligation to pay a judg-
ment).
 Despite the various formulations found in the case law of
the circuits, the basic approach is very similar, looking to fac-
tors such as control, state-law characterizations, and funding
sources. Most importantly, these cases make clear that legal
liability is the primary factor in considering the status of local
education entities. These cases also clarify that it is not the ul-
timate source of the funds paid to a judgment that is significant
No. 21-3339 35

but rather whether the state has an obligation to satisfy the
judgment.
 C.
 To ascertain the role that the regional offices of education
play in public education, we begin by examining the content
of Illinois law. Illinois law divides the state into thirty-five re-
gional offices of education, each of which encompasses one or
more counties and serves the school districts within its geo-
graphical area. Ill. Admin. Code tit. 23, §§ 525.10, 525.20;
 36
School Code § 2-3.62.
 Illinois’s regional offices of education occupy an interme-
diate position within the State’s public education system, be-
tween school districts on the one hand and the Illinois State
 37
Board of Education (ISBE) on the other. The ISBE is created
by the state constitution and is vested with powers to “estab-
lish goals, determine policies, provide for planning and eval-
uating education programs and recommend financing.” Ill.
Const. art. X, § 2. The regional offices are authorized by the

36 As noted earlier, Cook County and the City of Chicago are subject to a
special organizational arrangement. See supra note 2.
37 See Ill. Ass’n of Reg’l Superintendents of Schs., Directory, July 1, 2020 –
June 30, 2021, at 5, https://iarss.org/wp-content/uploads/2020/10/IARSS-
Directory_2020_2021_web-1.pdf (“As an intermediate agency between the
Illinois State Board of Education and local school districts, the office of the
Regional Superintendent performs regulatory functions as directed by the
Illinois School Code.”).
36 No. 21-3339

School Code, §§ 2-3.62, 3A-4, and the regions are defined ad-
 38
ministratively by the ISBE, Ill. Admin. Code tit. 23, § 525.20.
 39
 The purpose of the regional offices of education is gener-
ally to coordinate and provide state-sponsored services to

38 The regional offices of education are to be distinguished from school
boards—which govern most school districts—and from regional boards
of school trustees—which generally have jurisdiction over territory coex-
tensive with the regional offices of education but which exercise separate
powers.
 The regional board of school trustees is “a body politic and corporate”
with “perpetual existence” and the “power to sue and be sued.” School
Code § 6-2. The regional superintendent is ex-officio secretary of the re-
gional board. Id. § 6-17; see also id. § 7-6(a). The basic purpose of the re-
gional board is to “hear[] and determine[] whether school district annex-
ation petitions should be granted or denied.” 32A Ill. L. & Prac. Schools
§ 83; School Code § 7-1; see generally Bd. of Educ. of Bloomington v. Cnty. Bd.
of Sch. Trs. of McLean Cnty., 222 N.E.2d 343 (Ill. App. Ct. 1966). In 1979, the
Illinois Attorney General issued an opinion concluding that members of a
regional board were not county officials, in part because the regional
board had a “separate corporate identity” and was “distinct and separate
from other bodies.” 1979 Ill. Att’y Gen. Op. No. 56, 1979 WL 21193; see also
1982 Ill. Att’y Gen. Op. No. 18, 1982 WL 42766 (A regional board “is a local
governmental entity distinct from the county or counties comprising it.”).
 A school board, for its part, is “a body politic and corporate created to
perform governmental functions relating to education of children in its
district.” Evans v. Benjamin Sch. Dist. No. 25, 480 N.E.2d 1380, 1384–85 (Ill.
App. Ct. 1985); see also 32A Ill. L. & Prac. Schools § 87; School Code § 1-3.
It has broad powers, including to “appoint all teachers and fix the amount
of their salaries,” School Code § 10-20.7, to make contracts, id. § 10-20.21,
and to levy taxes and borrow money, within limits, e.g., id. §§ 11E-85, 17-
2, 19-1, 19-3.
39 The School Code frequently uses the term “educational service center”
or “educational service region.” See, e.g., School Code § 2-3.62. These are
synonymous with “regional office of education.” Section 3-0.01 states that
a “regional superintendent” shall be the “chief administrative officer” of
No. 21-3339 37

schools within their regions, including by assisting with
“planning, implementation and evaluation of … computer
technology education [and] mathematics, science and reading
resources for teachers”; providing “continuing education, in-
service training and staff development”; and providing
“training, technical assistance, coordination and planning in
other program areas such as school improvement, school ac-
countability, financial planning,” health programming, and
alternative and special education. School Code § 2-3.62. In car-
rying out their functions, the regional offices are subject to the
“rules and regulations” promulgated by the ISBE “delin-
eat[ing] the scope and specific content” of their programs “as
well as the specific planning, implementation and evaluation
services to be provided by” the regional offices. Id.; see also Ill.
Admin. Code tit. 23, § 525.60 (providing for annual evalua-
tions by the ISBE).
 Each regional office of education has as its chief adminis-
trative officer a regional superintendent. School Code
 40
§ 3-0.01. The regional superintendent is elected by voters
within the region and takes an oath prescribed by the state

each “educational service region” and that his or her office is to be referred
to as the “regional office of education.” See also Ill. Admin. Code tit. 23,
§ 525.10(a) (referring to the entities described in § 2-3.62 of the School
Code as “Regional Offices of Education”).
40 The School Code refers to this position variously as “regional superin-
tendent” and “county superintendent.” Section 3-0.01 provides that any
reference to “county superintendent” means the “regional superinten-
dent.” See also Ill. Att’y Gen. File No. 92-007 (1992), 1992 WL 469746 (“The
title of the office was changed from ‘county superintendent of schools’ to
‘regional superintendent’ by Public Act 79–1057, effective October 1,
1975.”).
38 No. 21-3339

constitution. Id. §§ 3-1, 3-2. In addition to carrying out the pur-
poses of the regional office as elaborated in the School Code
and the Administrative Code, see id. § 2-3.62; Ill. Admin. Code
tit. 23, § 525.10, the regional superintendent has broad super-
visory powers over the school districts in the region to ensure
compliance with the ISBE’s requirements. School Code
§ 3-14.2 (“supervision and control”). These powers include:
giving teachers and school officers direction in teaching meth-
ods, id. § 3-14.6; acting as “official adviser and assistant of the
school officers and teachers,” in performance of which duty
he or she “shall carry out the advice of [the ISBE],” id. § 3-14.7;
notifying school districts of the amount of money he or she
has distributed to them, id. § 3-14.17; inspecting school build-
ings for health and safety compliance, id. § 3-14.21; recom-
mending that the ISBE impose or remit a withholding-of-
funds penalty, id. §§ 3-15.2, 2-3.24; directing “in what manner
school treasurers shall keep their books and accounts,”
id. § 3-15.3; and removing “any member of a school board
from office for willful failure to perform his official duties,”
id. § 3-15.5.
 The regional superintendent also has certain duties both
to the State and to the county. With respect to the State, the
superintendent is required: to present “all financial state-
ments, books, vouchers and other records required” to the Il-
linois Auditor General pursuant to that office’s rules,
id. § 3-6.1; to collect financial reports from school districts and
provide those reports to the ISBE, id. § 3-15.1; and to present
annually to the ISBE “such information relating to schools in
his region as [the ISBE] may require,” id. § 3-15.8. With respect
to the county, the regional superintendent must: quarterly
present to the county board a report of all official acts, includ-
ing a list of schools visited, id. § 3-5; report annually to the
No. 21-3339 39

county board financial books, which include balance on hand,
receipts, amounts distributed to each school treasurer, and
books and vouchers for expenditures, id. § 3-6; apportion and
distribute as directed all moneys he or she receives that are
due to local school districts, id. § 3-9; and provide an “opinion
and advice” in “all controversies arising under the school
law,” certifying a “written statement of facts” if an appeal is
taken to the ISBE, id. § 3-10. If the regional superintendent
fails or refuses to make required reports to the county board
or otherwise engages in “any palpable violation of law or
omission of duty,” the county board may remove him or her
from office. Id. § 4-10. Additionally, the county board is re-
quired to examine the regional superintendent’s financial
statements. Id. § 4-7. Board members are liable “individually
to the fund injured and to the sureties” of the regional super-
intendent “for all damages occasioned by neglect” of this ex-
amination duty. Id.
 The funding sources for the regional offices are mixed.
Each regional superintendent, along with any assistant re-
gional superintendents he or she is authorized to appoint, re-
ceives a salary set by the School Code and payable monthly
by the ISBE out of the state education budget. Id. § 3-2.5. The
Illinois Appellate Court, however, has suggested that the
source of an officer’s salary has little probative value on his or
her categorization as a state officer or a county officer. See Sub-
urban Cook Cnty. Reg’l Off. of Educ. v. Cook Cnty. Bd., 667 N.E.2d
1064, 1068–70 (Ill. App. Ct. 1996).
 Notably, county boards are permitted to “provide for ad-
ditional compensation” for regional superintendents if they
wish. School Code § 3-2.5. The regional superintendent also
may employ additional persons as needed to discharge the
40 No. 21-3339

office’s duties, but these employees are paid by the county
and are subject to the approval of the county board.
Id. §§ 3-15.6, 4-6. The county has a duty to provide the re-
gional superintendent with “a suitable office with necessary
furniture and office supplies,” id. § 4-2, and it may cover “rea-
sonable traveling expenses” for the office as it deems appro-
priate, id. § 4-4. Beyond these sources, the regional offices
must seek grants from the ISBE for funding of their programs
and work. Id. § 2-3.62(d). For legal representation, the re-
gional superintendent is entitled to rely on the services of the
state’s attorney for the county where the regional office is lo-
cated. Id. § 3A-15.
 We find helpful insight on the very important question of
liability in a 1992 opinion of the Illinois Attorney General. See
Status of Regional Superintendent of Schools, Ill. Att’y Gen. File
 41
No. 92-007 (1992), 1992 WL 469746. That opinion addressed
the question of “whether a regional superintendent of schools
is considered a State employee, for purposes of indemnifica-
tion and representation” under the State Employee Indemni-
fication Act, “or, alternatively, whether a regional superinten-
dent is considered a county employee, whom the county is
responsible for indemnifying or insuring against liability.” Id.
Reviewing both the State Employee Indemnification Act and
the Local Governmental and Governmental Employees Tort
Immunity Act, the Attorney General concluded that a

41 The statutory provisions discussed in that letter and in this paragraph
have been recodified. The relevant provisions are now found at 745 ILCS
10/1-206 (defining “local public entity” to include an “educational service
region”) and 5 ILCS 350/1 (“The term ‘State’ means the State of Illinois …
or any other agency or instrumentality of the State,” but it “does not mean
any local public entity as that term is defined in [745 ILCS 10/1-206].”).
No. 21-3339 41

regional superintendent was neither a state nor a county em-
ployee. Id. The latter statute defined an “educational service
 42
region” (synonymous with a regional office of education) as
a “local public entity.” Thus, on the one hand, “because the
regional superintendent is the chief administrative officer of
a local public entity, rather than an agency or instrumentality
of the State,” he or she was not a state employee. Id. But, on
the other hand, even though “the regional superintendent
performs certain duties with respect to the county board” and
“the county board also performs certain duties with respect
to the regional superintendent,” the Local Governmental and
Governmental Employees Tort Immunity Act “clearly differ-
entiates between educational service regions and counties.”
Id. And under the statute, “an educational service region is
empowered to protect itself and its employees and officers
against liability.” Id. In sum, the Attorney General’s opinion
suggests that Illinois law treats a regional office as a local en-
tity that is neither an “instrumentality” of the State nor an ex-
 43
tension of a county.

42 See supra note 39.

43 The School Code has an express provision treating enforcement of judg-
ments against school boards and regional boards of school trustees. Sec-
tion 22-3 of the School Code provides that a court enforcing such judg-
ments “shall enter an order commanding the directors, trustees and school
treasurer to cause” the appropriate amount “to be paid … out of any mon-
eys of the township or district unappropriated, or if there are no such
moneys, out of the first moneys applicable to the payment of the kind of
services or indebtedness for which the judgment is entered which shall be
received for the use of the township or district.” Moreover, the enforcing
court may “requir[e] such board to levy a tax for the payment of the
42 No. 21-3339

 D.
 A study of the Illinois School Code gives us a basic idea of
the role of the regional office of education, but it hardly pro-
vides sufficient information to establish that, as a matter of
federal law, such an entity is an “arm of the state.” There is a
pronounced ambiguity on the key question of whether the
State would incur the legal liability to pay any monetary judg-
ment against the regional office. Indeed, DuPage admits in its
brief that, although it does not have the authority to raise
taxes to pay an adverse judgment, any damages would likely
be paid using local registration fees and “evidence-based
 44
funding dollars” from the State.
 The weight of authority—including this court’s deci-
sions—views the State’s legal liability as the most important
factor. Courts do not look to the source of funds that will be
used to pay a judgment but instead to whether the State bears
some obligation to satisfy judgments against the entity. E.g.,
Gary A., 796 F.2d at 944–45; Parker, 667 F.3d at 927–28; Febres,
 45
445 F.3d at 235–37; cf. Belanger, 963 F.2d at 252. Additionally,

judgment.” Id. There appears to be no similar provision applicable to the
regional offices of education.
44 Pet’r’s Br. 8–9.

45 We note that, in Perez, the Fifth Circuit evaluated a Texas entity with a
similar legal status to that of an Illinois regional office and found it to be
an arm of the state. 307 F.3d at 331. Perez, however, did not apply an ex-
acting standard of legal liability; rather, it found that it was sufficient to
show that a judgment against the education entity there “likely … would
be paid in large portion by the state.” Id. at 329. Consistent with our and
most circuits’ precedents, we expect an entity asserting arm-of-the-state
No. 21-3339 43

when an entity facially appears to be local or regional rather
than statewide, the entity will need to make a stronger show-
ing to establish itself as an arm of the state. For instance, in
Lightfoot, 771 F.3d at 771–73, the court held that Georgia’s ex-
tensive regulation of education policy in local school districts
did not amount to sufficient state control to turn the school
districts into arms of the state. Similarly, Woods, 466 F.3d at
248, found that the New York State education commissioner’s
broad powers to remove local education officials and review
school boards’ actions did not amount to a veto power under
that court’s precedent. By contrast, in Sturdevant, 218 F.3d at
1167–71, the Tenth Circuit conceded that the State Board for
Community Colleges had a significant degree of autonomy,
but it relied heavily on the fact that it served the State as a
whole to conclude that it was an arm of the state.
 DuPage’s inability to establish that the State of Illinois
would be liable for any monetary judgment, combined with
its inability to demonstrate that a regional office of education
is anything other than an important but local administrator of

status to show that the State bears a legal obligation to satisfy a judgment
or debt against it.
 Further, we note that the education service centers in Perez are distin-
guishable from Illinois regional offices in other important respects.
Whereas an executive director of an education service center is subject to
approval and removal by the state education commissioner, id. at 330, an
Illinois regional superintendent is elected solely by local voters and re-
movable by county officials. Moreover, the Illinois Attorney General has
opined that a regional superintendent is not a state officer, and Illinois
statutes treat regional offices as local entities for purposes of employee in-
demnification. By contrast, Perez observed that Texas case law treated a
lawsuit against an education service center as a lawsuit against the state.
Id. at 328.
44 No. 21-3339

the local school systems, makes clear that it has not shoul-
dered its burden of establishing that it is an “arm of the state.”
See Woods, 466 F.3d at 237–38 (“[T]he governmental entity in-
voking the Eleventh Amendment bears the burden of demon-
strating that it qualifies as an arm of the state entitled to share
in its immunity.”). Because DuPage has not shown that it was
entitled to immunity from the Department’s adjudication of
Sanchez’s whistleblower complaint, we turn to the merits of
 46
the ALJ’s decision.
 The Merits
 A.
 We begin our consideration of the merits of this case by
setting forth the statutory landscape.
 To protect public funds from waste, fraud, and abuse,
Congress established certain requirements, applicable to all
federal contractors and grantees, to encourage the reporting
of misuse of federal funds. The case before us today requires
that we review the Department of Education’s application of
a key provision of that congressional effort, Section 4712 of
Title 41. This section prohibits federal contractors and grant-
ees from discharging, demoting, or otherwise discriminating
against an employee for making a “disclosure.” The statute
defines a protected disclosure as “information that the em-
ployee reasonably believes is evidence of gross mismanage-
ment of a Federal contract or grant, a gross waste of Federal
funds, an abuse of authority relating to a Federal contract or

46 Because DuPage has not met its burden of showing that it is an arm of
the state, we need not reach the issue of whether there was a waiver of
sovereign immunity.
No. 21-3339 45

grant, … or a violation of law, rule, or regulation related to a
Federal contract … or grant.” 41 U.S.C. § 4712(a)(1). The dis-
closure must be made to an individual or a body specified in
the statute, including an Inspector General or a management
official. See id. § 4712(a)(2).
 To obtain relief under this provision, an employee must
(1) make a protected disclosure (2) to a person specified in the
statute, and (3) suffer a reprisal for making the protected dis-
closure. After establishing these three elements, the employee
must further demonstrate that the protected disclosure was a
“contributing factor” in the personnel action that was taken
against the employee. The employer must then demonstrate
by clear and convincing evidence that it would have taken the
same action even if the disclosure had not occurred. In this
respect, the statute adopts the legal burdens of proof set forth
in the Whistleblower Protection Act. See id. § 4712(c)(6)
(adopting the burdens of proof of 5 U.S.C. § 1221(e)).
 The statute also sets forth the administrative and judicial
framework in which the employee must seek relief. An em-
ployee may submit a complaint to the Inspector General of the
agency. Id. § 4712(b)(1). That officer will then undertake an in-
vestigation and submit a report to the head of the agency. Id.
The agency head must either issue an order denying relief or
take action to remedy the injury. Id. § 4712(c)(1). A remedial
order may include a direction to abate the reprisal, to grant
reinstatement with back pay and benefits, and to restore other
terms and conditions of employment that would have applied
if the reprisal had not been taken. Id. Costs and expenses in-
curred by the employee, including attorneys’ fees, also may
be granted. Id.
46 No. 21-3339

 An employee denied relief by the agency may bring a de
novo action for relief in the appropriate district court. Id.
§ 4712(c)(2). Alternatively, any person adversely affected by
the agency order may seek relief in the court of appeals. Pro-
ceedings in the court of appeals are governed by the provi-
sions of the Administrative Procedure Act. Id. § 4712(c)(5)
(adopting the review provisions of Chapter 7 of Title 5).
 In evaluating Sanchez’s claims, the ALJ employed the bur-
den-shifting scheme required by the whistleblower statute.
See id. § 4712(c)(6) (directing adjudicators to apply the scheme
in 5 U.S.C. § 1221(e)). Sanchez therefore had the initial burden
of showing by a preponderance of the evidence that a disclo-
sure was a “contributing factor” in a decision to take a per-
sonnel action. 5 U.S.C. § 1221(e)(1). He could meet that bur-
den with circumstantial evidence, such as evidence that “the
official taking the personnel action knew of the disclosure”
and that “the personnel action occurred within a period of
time such that a reasonable person could conclude that the
disclosure or protected activity was a contributing factor in
the personnel action.” Id. § 1221(e)(1)(A)–(B). If Sanchez were
to meet his burden, DuPage could avoid liability by showing
“by clear and convincing evidence that it would have taken
the same personnel action in the absence of such disclosure.”
Id. § 1221(e)(2).
 It is important to note, at the outset, two characteristics of
the whistleblower provisions that we have just set out. First,
with respect to the first prong of the statutorily mandated
analysis, Congress has made very clear that this “contributing
factor” element may be met with circumstantial evidence,
such as evidence that the retaliating official “knew of the dis-
closure … and … the personnel action occurred within a
No. 21-3339 47

period of time such that a reasonable person could conclude”
that the disclosure was a contributing factor in it. Id.
§ 1221(e)(1)(A)–(B); see Kewley v. Dep’t of Health & Hum. Servs.,
153 F.3d 1357, 1361–62 (Fed. Cir. 1998) (describing Congress’s
explicit correction of an earlier misapprehension of the neces-
sary quantum of evidence in Clark v. Dep’t of the Army, 997
F.2d 1466 (Fed. Cir. 1993)). We have described this “contrib-
uting factor” standard as requiring “something less than a
substantial or motivating” factor standard. Addis v. Dep’t of
Lab., 575 F.3d 688, 691 (7th Cir. 2009). This element therefore
does not impose upon the complainant a high hurdle: “[T]he
circumstantial evidence of knowledge of the protected disclo-
sure and a reasonable relationship between the time of the
protected disclosure and the time of the personnel action will
establish, prima facie, that the disclosure was a contributing
factor to the personnel action.” Horton v. Dep’t of the Navy, 66
F.3d 279, 284 (Fed. Cir. 1995). As the court in Kewley noted,
Congress has suggested that “an action taken within the same
performance evaluation period w[ill] normally be considered
within a ‘reasonable time.’” Kewley, 153 F.3d at 1363 (quoting
S. Rep. No. 100-413, at 15 (1988)). Thus, Congress has given
clear guidance that the adjudicators within the agency are to
“use this reasonable time standard liberally.” Id.
 The second notable characteristic of this statutory lan-
guage is that, in affording the employer the opportunity to
rebut the prima facie showing, the statute requires explicitly
that the employer must meet the “clear and convincing”
standard, not the simple preponderance standard. Congress
employed this standard because the rebuttal case only comes
into play once the prima facie case has been established and
because the employer usually holds all the evidentiary cards.
See Whitmore v. Dep’t of Lab., 680 F.3d 1353, 1367 (Fed. Cir.
48 No. 21-3339

2012) (quoting 135 Cong. Rec. H747–48 (daily ed. Mar. 21,
1989)). As the court in Kewley noted, Congress, in employing
this standard, sought to accommodate two competing consid-
erations: It wanted to ensure that an employer would not be
able to rely on “any possible flaw in an employee’s work rec-
ord as an excuse for retaliation”; at the same time, it did not
intend that “employees who are poor performers escape sanc-
tion by manufacturing a claim of whistleblowing.” Kewley,
153 F.3d at 1363 (quoting S. Rep. No. 100-413, at 15 (1988)).
 In determining whether the employer has met its shifted
burden, the factors articulated in Carr v. Social Security Admin-
istration seem to have garnered wide approval. Thus, courts
look to
 the strength of the [employer’s] evidence in sup-
 port of its personnel action; the existence and
 strength of any motive to retaliate on the part of
 the [personnel] who were involved in the deci-
 sion; and any evidence that the [employer] takes
 similar actions against employees who are not
 whistleblowers but who are otherwise similarly
 situated.
185 F.3d 1318, 1323 (Fed. Cir. 1999). In evaluating each of these
factors, the decision-maker must consider all of the record ev-
idence. “Evidence only clearly and convincingly supports a
conclusion when it does so in the aggregate considering all
the pertinent evidence in the record, and despite the evidence
that fairly detracts from that conclusion.” Whitmore, 680 F.3d
at 1368.
 The standards governing our own review are also clearly
set forth in the statute. Section 4712(c)(5) incorporates the
No. 21-3339 49

judicial review provisions of the Administrative Procedure
Act. Therefore, we will not disturb the agency’s legal deter-
minations “as long as they are not arbitrary or capricious, and
are in accordance with the law.” Israel v. U.S. Dep’t of Agric.,
282 F.3d 521, 526 (7th Cir. 2002). Under that deferential stand-
ard, “we must uphold the action if the agency considered all
of the relevant factors and we can discern a rational basis for
the agency’s choice.” Id. The agency’s factual findings are re-
viewed for substantial evidence, meaning “such relevant evi-
dence as a reasonable mind might accept as adequate to sup-
port the conclusion” it reached. Huck Store Fixture Co. v.
NLRB, 327 F.3d 528, 533 (7th Cir. 2003). While this standard is
obviously a deferential one, we are unable to fulfill our re-
sponsibility when the agency adjudicator “fails to provide an
in depth review and full discussion of the facts to explain its
reasoning.” Whitmore, 680 F.3d at 1368. “If considerable coun-
tervailing evidence is manifestly ignored,” the decision must
be vacated and remanded. Id.
 B.
 With this statutory landscape in mind, we now turn to the
justifications offered by the Department of Education for its
determination.
 1.
 First Reprisal.
 As we noted earlier, Sanchez made his first disclosure
around April 2018 when Hunt submitted an invoice to him
for a roughly $10,000 breakfast expense, to be paid from the
SEED grant. Sanchez told Hunt that the invoice was not an
allowable expense under federal grant rules and, despite
Hunt’s insistence, refused to pay the invoice.
50 No. 21-3339

 The OIG found that Sanchez’s disclosure concerning unal-
lowable catering expenses was a contributing factor in his re-
moval from SEED grant financial oversight duties based on
Hunt’s knowledge of the disclosure and the temporal prox-
imity of the action. Although the OIG did not accept that
Ruscitti or Haller had knowledge of Sanchez’s disclosure at
the time, Hunt did have knowledge, and “Hunt removed
 47
these duties only one month” after the disclosure. The OIG
also took the view, however, that ISU’s change in budget pol-
icy—a decision to limit SEED grant financial oversight to ISU
employees—constituted “clear and convincing evidence that
[DuPage] would have removed his financial duties regardless
 48
of this disclosure.” Thus, the removal was not retaliatory.
 Like the OIG, the ALJ found that Sanchez’s disclosure
about catering expenses was a contributing factor to his re-
moval of SEED grant duties. The ALJ first noted that the al-
leged reprisal “occurred nearly simultaneously with [the] dis-
 49
closure.” The ALJ also found that “[c]learly” Haller had
knowledge of the disclosure “contemporaneously with the
events”: Haller said she only learned of the events “after they
occurred,” but the ALJ apparently did not credit that because
Haller’s interview notes failed to provide an estimate of when
 50
she knew of them. In the ALJ’s view, DuPage’s claim that it

47 App. 33.

48 Id. at 33–34.

49 Id. at 1127.

50 Id.
No. 21-3339 51

lacked knowledge of the disclosure was “completely contra-
 51
dicted by” Dotson’s interview.
 The ALJ did not address directly whether DuPage had met
its burden of establishing by clear and convincing evidence
that the same decision about Sanchez’s continued participa-
tion in the SEED program would have been reached if he had
not made the disclosure. Although the issue was squarely be-
fore her, the opinion contains no substantive discussion of the
issue. In its submission to the ALJ, DuPage had pointed out
that ISU was a separate entity from DuPage, that the SEED
grant was administered by ISU, that Sanchez made his disclo-
sure to Hunt (an ISU employee), and that ISU chose to remove
Sanchez (and all non-ISU employees) from grant oversight
positions. DuPage contended that these facts precluded a de-
termination that Sanchez’s disclosure was a contributing fac-
tor in any action by DuPage.
 DuPage did not control ISU. ISU’s decision to remove all
DuPage personnel from financial oversight of the grant ad-
ministered by ISU would have resulted in Sanchez’s removal
from these duties regardless of any disclosure to DuPage. The
ALJ’s failure to consider, in any meaningful way, the signifi-
cance of ISU being a separate entity from DuPage—which
calls into question how DuPage could be responsible for ISU’s
decision to remove Sanchez from those duties—is a major
flaw in its analysis. To put it mildly, the question whether Du-
Page could even be liable for ISU’s decision was an exceed-
ingly “relevant factor.” Israel, 282 F.3d at 526. The ALJ’s fail-
ure to grapple with it prevents us from discerning “a rational
basis for the agency’s choice.” Id. If the ALJ had applied

51 Id. at 1128.
52 No. 21-3339

carefully the Carr factors, she would have assessed not only
the strength of the evidence supporting a personnel decision
and the existence of any retaliatory motive but also, as a
threshold matter, whether the decision was even attributable
to DuPage. Carr, 185 F.3d at 1323. We therefore cannot sustain
the determination.
 2.
 Second Reprisal.
 The OIG determined that Sanchez’s disclosures were not
a contributing factor in his change of duties between Decem-
ber 2018 and March 2019. The OIG found that none of the of-
ficials involved in this change—“to include Haller, Hunt or
Ruscitti”—had any knowledge of the catering disclosure from
 52
April 2018. And because this personnel action “occurred or
was initiated likely prior to his second protected disclosure”
in January and February 2019, that disclosure “could not have
 53
been a contributing factor.” The OIG concluded that, in any
case, the change of duties was simply a result of Sanchez’s de-
ficient performance on the data infrastructure work.
 The ALJ disagreed. She noted that the change of duties oc-
curred over a period of months: Hunt decided in December
2018 that she intended to bring in a data infrastructure con-
sultant; the planned change of duties was communicated to
Sanchez in December 2018 or January 2019; and Sanchez’s
new job description was finalized in March 2019. The ALJ

52 Id. at 34. As noted earlier, the OIG misstated its finding here. Hunt
plainly knew of the April 2018 catering disclosure, as the OIG found in its
discussion of the first alleged reprisal. See id. at 33.
53 Id. at 34–35.
No. 21-3339 53

therefore found the temporal proximity between the second
disclosure (January 2019) and the change of duties to be dis-
positive. Although the disclosure occurred “after [DuPage]
began to consider a job change,” it was “before the new job
description … was created and implemented. This timing is
sufficient to establish the second disclosure is a contributing
 54
factor for this personal [sic] action.”
 In the ALJ’s view, DuPage also did not carry its burden of
showing that it would have changed Sanchez’s duties even
absent the disclosure(s). DuPage had argued that (a) the
change of duties was the “direct and sole result” of Sanchez’s
lack of skills and professional connections necessary to per-
form the work and (b) the OIG’s finding that the second dis-
closure occurred after the change in duties meant it could not
 55
possibly be a contributing factor. The ALJ did not address
the first claim but rejected the second claim because Sanchez’s
new duties were not finalized until March 2019, after the sec-
ond disclosure. “That alone” was enough to show that Du-
 56
Page did not meet its burden.
 Even if we accept that the ALJ addressed adequately Du-
Page’s second argument (regarding the change of duties), we
cannot say the same with respect to the first (regarding
Sanchez’s competence). The ALJ simply noted the first argu-
ment and disposed of it by repeating her reasoning for accept-
ing the second argument. Even under the deferential standard
of review that we employ in these cases, this oversight simply

54 Id. at 1130.

55 Id.

56 Id.
54 No. 21-3339

cannot pass muster. DuPage’s view of Sanchez’s abilities, if
credited, would have been a satisfactory defense. But the ALJ
did not explain whether she credited those claims or, if not,
why she did not. Instead, the ALJ stated that her rejection of
the timeline argument “alone” was “enough” to find that Du-
 57
Page had not met its burden. Had the ALJ adhered to the
well-established Carr factors, she would have explored vigor-
ously the “strength of [DuPage’s] evidence in support of its
personnel action.” Carr, 185 F.3d at 1323. Instead, the ALJ
failed to grapple with record evidence demonstrating Du-
Page’s serious concerns that Sanchez lacked the skills and
 58
professionalism to perform these duties competently. This
approach constitutes a failure to consider a relevant factor
and rendered the ALJ’s decision on this point arbitrary and
capricious.
 3.
 Third Reprisal.
 As noted earlier, the third alleged reprisal occurred on
March 11, 2019, when DuPage placed Sanchez on an EPP that
 59
ran from March 11 to September 30. The stated purpose of

57 Id.

58 E.g., id. at 104, 185.

59 Although the EPP was reportedly issued on March 11 during a meeting
with Sanchez, there is some uncertainty as to when Sanchez received a
copy of the EPP. His signature on the document is dated April 26, 2019,
and he denied receiving a copy of it before that date. Id. at 114–15, 144,
1094.
No. 21-3339 55

the EPP was to “allow the employee the opportunity to
 60
demonstrate competency and commitment” to his work.
 The OIG concluded that the temporal proximity of the EPP
to the second disclosure and the knowledge of the officials in-
volved—Haller, Hunt, Ruscitti, and Dotson—demonstrated
that Sanchez’s disclosure was a contributing factor to his
placement on an EPP on March 11, 2019. The OIG further
found, however, that “numerous e-mails and witness testi-
mony” from DuPage personnel showed that Sanchez had
“significant performance issues” and that DuPage had ac-
cordingly shown by clear and convincing evidence that it
would have placed Sanchez on an EPP regardless of his dis-
 61
closures.
 The ALJ had little difficulty with the first prong on the
statutory analysis. She found that Sanchez’s disclosures were
contributing factors to his placement on an EPP. That deter-
mination is supported by the record. We will pretermit exten-
sive discussion of this conclusion; given the lenient standard
of proof mandated by the statutory language, there was suffi-
cient circumstantial evidence of DuPage’s knowledge of the
disclosures and sufficient temporal proximity between the
second disclosure and the start of the EPP to justify the De-
partment’s determination.
 The second prong of the statutory analysis, dealing with
DuPage’s burden to establish by clear and convincing evi-
dence that it would have implemented the EPP even in the
absence of the disclosure, gives us significant pause. The ALJ

60 Id. at 344.

61 Id. at 37.
56 No. 21-3339

declined to credit DuPage’s justifications. She pointed to what
she deemed to be inconsistencies in the record concerning the
lead-up to the EPP, “vagueness regarding key details of when
the EPP was created,” and a suspicious delay in Sanchez’s
 62
signing the EPP. The ALJ concluded that these inconsisten-
cies and ambiguities “reduce[d] the probative value of the ev-
idence” DuPage offered to support its defense that the EPP
 63
“was only to help improve [Sanchez’s] work performance.”
 As we have noted earlier, it is well established that, in
making its determination, the agency must take into consid-
eration all the evidence of record. Whitmore, 680 F.3d at 1368.
Here, the ALJ’s analysis fails to establish that it paid adequate
consideration to the detailed evidence that, prior to his being
placed on the EPP, Sanchez’s overall job performance had
raised serious concerns. Haller, who certainly acted as his de
facto supervisor, detailed those concerns in her statement to
the OIG. She noted that, with respect to a funded project that
included other regional offices of education, he had responsi-
bility for “supporting development efforts in the other [re-
gional offices] and the data infrastructure work that will sup-
 64
port the entire project.” Yet, despite her asking him several
times to contact the coordinators in these organizations and
to get baseline information on what data they collected, he
had not contacted those coordinators and, indeed, had not
even identified them, much less visited them.

62 Id. at 1132–33.

63 Id. at 1133.

64 Id. at 127.
No. 21-3339 57

 Haller also expressed concern about Sanchez’s lack of or-
ganization and his failure to adopt work habits that permitted
 65
smooth communication with other staff members. After ac-
cepting assignments or making commitments to others, he
would fail to follow through on those obligations and cause
 66
lapses in the organization’s reliability and productivity. He
failed to fix a spreadsheet even after he realized that it was
producing outdated and inaccurate data that had to be cor-
 67
rected by others. One of the consequences of his failure to
work in an organized manner was the production of
“[e]xpense tracking spreadsheets that were off by hundreds
 68
of thousands of dollars.” His communications with individ-
uals outside the organization often lacked professionalism.
Attempts to improve his accountability within the organiza-
 69
tion faltered because of his lack of cooperation.
 Haller attributed this poor performance to a lack of
knowledge and capacity with technology and a lack of under-
 70
standing of basic accounting principles. She recognized that
there was a need to improve the definition of his role within
the organization, but also noted that efforts toward

65 E.g., id. at 375–76, 389–90, 392–93, 399, 403, 449–52.

66 E.g., id. at 365–66, 377, 395–97, 415–17.

67 Id. at 415.

68 Id. at 127.

69 E.g., id. at 365.

70 Id. at 110, 112.
58 No. 21-3339

clarification had been thwarted by Sanchez’s refusal to
acknowledge the leadership role of the project directors.
 The ALJ’s focus on the procedure employed at the March
2019 meeting where the leadership decided to place Sanchez
on an EPP and the subjective impression of the meeting’s par-
ticipants fails to grapple in any significant way with the hard
evidence that DuPage had solid, and to a great degree unre-
butted, reasons to seek a substantial improvement in Sanchez’s
performance. The ALJ’s failure to confront that evidence ren-
ders her decision arbitrary and capricious and unsustainable
as a matter of law.
 4.
 Fourth Reprisal.
 As we noted earlier, the fourth alleged reprisal stemmed
from a complaint by an ISU employee. That employee de-
tailed three incidents when Sanchez’s computer displayed in-
appropriate sexual material to a coworker in a work-related
situation. When this matter came to the attention of DuPage
officials, the Assistant Regional Superintendent for Business
and the Assistant Superintendent for Operations issued a
PAR stating Sanchez’s deviations from DuPage policies and
setting forth remedial action that Sanchez had to take to avoid
similar deviations in the future.
 The ALJ’s reasoning in finding Sanchez’s disclosures a
contributing factor in the issuance of the PAR is problematic.
The ALJ first laid out her factual findings about the content of
the PAR, including her view that the PAR “misreport[ed]”
 71
one of the incidents described in Shoop’s email. But when

71 Id. at 1135.
No. 21-3339 59

determining whether the disclosures were a contributing fac-
tor in the issuance of the PAR, she merely stated that the PAR
was issued during the EPP period and that, “[a]though [it] oc-
curred about seven months after [DuPage] had knowledge of
the second disclosure, there [wa]s still reason to conclude”
 72
that it was a contributing factor. Despite her view that the
PAR misreported one of the incidents (an assertion for which
she gave little elucidation), the ALJ did not say whether this
factor informed her conclusion that the disclosures were a
contributing factor in its issuance. Apart from a conclusory
 73
view that the PAR was “directly tied” to the EPP, we are
given no basis for her conclusion that the disclosures were in
any way tied to Sanchez’s failure to conform to the computer
policies of DuPage.
 The ALJ’s determination that DuPage did not carry its
shifted burden is especially problematic. She pointed out, cor-
rectly, discrepancies in the record concerning Assistant Su-
perintendent Robey’s claim that Sanchez admitted to all the
incidents. However, the ALJ also mischaracterized Robey’s
interview notes while evaluating the PAR meeting, suggest-
ing that Robey and Dotson each tried to pin responsibility for
the PAR on the other. While the ALJ accurately noted that
 74
Dotson pointed to Robey as the main actor in this process,
Robey did not similarly point to Dotson. The ALJ quoted
Robey as saying that Dotson “sat down with [Sanchez] … and

72 Id.

73 Id.

74 Compare id. (ALJ decision) with id. at 218 (Dotson’s interview notes).
60 No. 21-3339

 75
ultimately issued a written remand [sic].” In fact, the inter-
view notes for Robey say Robey “recalled that he and Dotson
sat down with Sanchez … and ultimately issued a written rep-
 76
rimand.” Both accounts indicate that Robey and Dotson
were present, and Robey’s account does not contradict Dot-
son’s statement that Robey took the lead.
 The reasoning of the ALJ cannot support the conclusion
that the PAR was retaliatory.
 5.
 Fifth Reprisal.
 This reprisal is predicated on Sanchez’s final termination.
The ALJ determined that Sanchez had met his burden of
showing one or both of his disclosures contributed to his ter-
mination because the termination was “closely tied” to the
EPP, itself an act of reprisal: His termination was “purport-
edly implemented based on the unsatisfactory rating” at the
end of the EPP period, on September 30, 2019, and so the EPP
 77
formed the basis for his termination. Thus, Sanchez’s show-
ing on the EPP essentially extended transitively to the termi-
nation as well.
 The ALJ also determined that DuPage failed to carry its
shifted burden. After reviewing documentation DuPage pro-
vided that discussed Sanchez’s performance failures “in ex-
cruciating detail,” the ALJ concluded “that by developing all

75 Id. at 1135.

76 Id. at 313 (emphasis added).

77 Id. at 1136.
No. 21-3339 61

these notes, [DuPage] was micromanaging [Sanchez’s] work
activities more than they were supporting his performance
 78
while he was subject to the EPP.” The ALJ also found that
DuPage did not follow all its policies related to performance
assessments—specifically, there was no evidence that Du-
Page conducted formal performance assessments as required
by policy until the end of the EPP period on September 30,
2019, at which point the decision was made to terminate
Sanchez’s employment. Finally, the ALJ found it troubling
that there was significant uncertainty concerning Sanchez’s
chain of supervision throughout his employment. This uncer-
tainty “undercut[]” DuPage’s assertion that it followed its
policies requiring an employee’s supervisor to participate in
 79
EPPs and performance appraisals.
 Because we have determined that the record will not sup-
port the ALJ’s determination that issuance of the EPP was an
act of retaliation, we cannot accept the ALJ’s conclusion that
the termination was retaliatory because it was based on the
EPP. For this reason alone, that determination cannot stand.
We note, however, several additional problems with the ALJ’s
reasoning that preclude our accepting, even under a deferen-
tial standard of review, her conclusion. First, the ALJ notes
that Sanchez was never afforded the initial review sessions
required by DuPage policy. But the ALJ never points to any
evidence supporting why these sessions are relevant to the
problems that precipitated later discontent with Sanchez’s
performance, many of which involved a lack of basic

78 Id.

79 Id. at 1137–38.
62 No. 21-3339

professional skills. The ALJ also relies on what she considers
a lack of clarity about Sanchez’s chain of supervision but does
not explore how that supposed lack contributed to the partic-
ular deficiencies that troubled DuPage management. Indeed,
she criticizes, again in conclusory fashion, management for
“micromanaging” Sanchez during the EPP period but does
not explain why “micromanaging” a struggling employee is
problematic.
 But the fundamental flaw in the ALJ’s treatment of this al-
leged reprisal is the failure to come to grips, in any meaning-
ful way, with the very significant record evidence of
Sanchez’s performance failures both before the EPP and dur-
ing the EPP period. This evidence is central to the case but
received scant attention by the ALJ. The ALJ’s failure to deal
in a meaningful way with this core issue renders the decision
arbitrary and capricious.
 CONCLUSION
 The petition for review is granted. The decision of the De-
partment of Education is vacated and the case is remanded to
the Department for further proceedings consistent with this
 80
opinion.
 The decision as to whether to assign this matter to another
ALJ rests, at least initially, with the Department. We respect-
fully suggest that the Department follow that course. See Del-
gado v. U.S. Dep’t of Just., 979 F.3d 550, 562 (7th Cir. 2020).

80 Because we must remand this case to the Department for further pro-
ceedings, we will pretermit any discussion of the Department’s decision
on the matter of remedy.
No. 21-3339 63

 Petition for Review Granted; Decision Vacated; Case Re-
manded.